UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| FUNDS IN THE AMOUNT OF $28,721 IN UNITED STATES CURRENCY, | ) ) ) | Judge |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

## **VERIFIED COMPLAINT FOR FORFEITURE**

The United States of America, by John R. Lausch, Jr., United States Attorney for the Northern District of Illinois, for its verified complaint against the above-named defendant funds alleges in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

### **Nature of the Action**

1. This is a forfeiture *in rem* brought pursuant to 21 U.S.C. § 881(a)(6), for forfeiture of the defendant funds in the amounts of $28,721 United States currency.

2. This complaint is verified by the attached affidavit of Drug Enforcement Administration ("DEA") Task Force Agent Anthony R. Terranova ("TFO Terranova"), which is fully incorporated herein.

### **Jurisdiction and Venue**

3. This Court has jurisdiction over an action commenced by the United States as the plaintiff under 28 U.S.C. § 1345, and over an action for forfeiture *in rem* under 28 U.S.C. § 1355(a).

4. This Court has *in rem* jurisdiction over the defendant funds pursuant to 28 U.S.C. § 1355(b)(1)(A), as certain of the acts giving rise to the forfeiture occurred within the Northern District of Illinois.

5. Venue is proper under 28 U.S.C. §§ 1355(b)(1)(A) and 1395(a) as certain of the acts giving rise to the forfeiture occurred within the Northern District of Illinois, and 28 U.S.C. § 1395(b) as the defendant funds were found within the Northern District of Illinois.

6. The defendant funds are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) as the funds (i) were furnished and intended to be furnished in exchange for illegal drugs; and/or (ii) are the proceeds from the sale of illegal drugs; and/or (iii) were funds used and intended to be used to facilitate trafficking of illegal drugs, in violation of 21 U.S.C. § 841, *et seq.*

## Factual Allegations

7. On October 24, 2017, DEA law enforcement officers assigned to O'Hare Airport, Chicago, Illinois, were alerted to the suspicious travel itinerary of Rahsie L. Garner ("Garner") and Prescious Peeples ("Peeples").

8. Specifically, Garner and Peeples were each traveling on a one-way ticket from Akron, Ohio, to Sacramento, California via Chicago, Illinois on United Airlines. Garner's ticket was purchased on October 23, 2017 by Garner, for $410. Peeple's ticket was purchased approximately 26 minutes after Garner's ticket.

9. Based upon the training and experience of the affiant, illegal drug couriers often purchase airline tickets one day or so prior to the scheduled departure. Additionally, based upon the affiant's training and experience, Sacramento, California, and the northern California region, is a known source area for illegal drug trafficking. Further, based upon the affiant's training and experience, those who transport illegal drugs, or the proceeds of illegal drug trafficking, often keep

them on their person or accompanying bags or suitcases. Based upon the above information, DEA agents sought to interview Garner and Peeples prior to boarding the United Airlines flight at Chicago's O'Hare Airport enroute to California.

10. On October 24, 2017, at approximately 6:10 p.m., TFO Terranova observed an individual in the area of gate C24 at O'Hare, the gate for the outbound flight from Chicago, who matched the description of Garner.

11. TFO Terranova approached Garner in the gate area. At the time, TFO Terranova and other law enforcement agents were dressed in civilian clothing with no weapons, radios, or other law enforcement paraphernalia visible. TFO Terranova identified himself as a law enforcement officer by displaying his credentials and badge and requested to speak with Garner. TFO Terranova informed Garner that he was not under arrest and was not in any trouble. Garner stated he understood and agreed to talk to TFO Terranova.

12. At that time, TFO Terranova requested to see Garner's boarding pass and a photographic form of identification. Garner produced an Auto Auction identification card, an Ohio driver's license bearing his name and photo likeness, and a boarding pass. TFO Terranova noted the information contained on the documents and immediately returned them to Garner.

13. TFO Terranova then inquired about Garner's travel plans. Garner stated that he was going to Sacramento to attend an auto auction. When TFO Terranova asked Garner if he was traveling with anyone Garner said that he was traveling alone. TFO Terranova noted to Garner that it appeared as if he may be traveling with someone. Garner said that since he was alone in the gate area that he was not traveling with anyone.

14. When TFO Terranova observed that Garner had one roller carry-on bag, he asked Garner if he had any checked luggage. Garner said no. When TFO Terranova asked Garner

whether he knew the contents of his luggage and if he had packed his luggage, Garner said yes. TFO Terranova asked then Garner if anyone had asked him to carry, bring, or hold anything for him during his travel, to which Garner said no.

15. When TFO Terranova asked Garner if he was carrying any electronic devices, liquids, weapons, or illegal drugs, Garner said no and opened his carry-on roller bag and showed TFO Terranova and TFO James Triantafillo that he had travel size bottles of toiletries. Garner further stated that the Transportation Security Administration had just asked him these questions. TFO Terranova advised Garner that he and the other law enforcement agents present were not with TSA but rather were with the DEA. TFO Terranova further explained that the DEA asks these questions to check for people who are smuggling contraband onto commercial aircrafts. Garner stated he understood.

16. TFO Terranova then asked Garner if he had any money in his bag. Garner replied that he had "a couple dollars." TFO Terranova asked Garner to explain what he meant and how much money he was traveling with. Garner now said he had $15,000 in his bag. When TFO Terranova asked Garner if $15,000 was all he had with him, Garner said yes.

17. TFO Terranova asked Garner for permission to search his carry-on roller bag to verify his statements. At the time, Garner gave oral consent to search his carry-on roller bag.

18. For limited privacy, Garner voluntarily agreed to relocate his carry-on roller bag to an area behind the desk at gate C24. TFO Terranova searched Garner's carry-on roller bag and located three bundles of United States currency.

19. Based on his training and experience, the bundles appeared to TFO Terranova to contain more than $15,000. TFO Terranova advised Garner that he suspected there was more than $15,000 in his bag and Garner said "I told you there was $20,000 or about $20,000 maybe $15-

4

20,000." TFO Terranova advised Garner that he initially said "a couple dollars," that Garner never mentioned $20,000, and that TFO Terranova asked him twice if he was sure. Garner said that he felt weird because law enforcement agents were not wearing uniforms. TFO Terranova reminded Garner that he had seen TFO Terranova's badge and credentials.

20. TFO Triantafillo asked Garner if he had any money in his pockets. Garner removed a bundle of United States currency from his pocket and handed it to TFO Triantafillo.

21. When TFO Terranova asked Garner again if he was with anyone or if he knew anyone on the flight, he said no. Based upon TFO Terranova's knowledge of the airline tickets purchased, he advised Garner that, at a minimum, Garner knew someone on the flight. Garner avoided a response by stating he owned an auto dealership and that he was going to a car auction. Garner has stated he was going to buy a "classic" car in California for $43,000.

22. TFO Terranova advised Garner that the agents wanted to continue the investigation further including a dog sniff. He further told Garner that he could accompany the agents to the DEA O'Hare office or was free to board his flight to California. Garner then voluntarily carried his carry-on roller bag and walked to the DEA O'Hare office.

23. During the walk to the DEA O'Hare office, Garner stated again that he was going to buy cars at an auto auction. TFO Terranova told Garner that $20,000 did not seem like enough money if he was going to buy a $43,000 car. TFO Terranova asked Garner why he did not buy cars at auto auctions in Ohio. Garner appeared agitated and said that the agents were asking a lot of questions.

24. TFO Terranova then told Garner that he was trying to ascertain if there was a legitimate source of the money. Garner said that he withdrew the money from a bank to go to California. TFO Terranova asked Garner if he could pull up an online account that showed the

withdrawal of the money, or if he could provide documentation. Garner said that he could not do that but that he had a legitimate business. TFO Terranova asked Garner if he paid taxes last year and Garner laughed and questioned who does not pay their taxes. When asked how much money he earned last year, Garner would not answer.

25. Once at the DEA O'Hare office, TFO Mike Ruiz recovered three bundles of rubber-banded United States currency from the carry-on roller bag. TFO Ruiz asked Garner how much currency was contained in the bundles. Garner said it may be up to $26,000.

26. While Garner was in the DEA O'Hare Office, TFO Terranova spoke with the other individual, Prescious Peeples, in the gate C24 area. TFO Amy Jenkins conducted a consensual search of Peeple's luggage where $3,000 in United States currency was located in her carry-on. The currency was returned to Peeples' bag. Peeples advised that she and Garner were traveling together but they were not seated together. Peeples further stated that while in Sacramento she fully expected to see Garner there but that they were going to see different people. Peeples added that she and Garner are friends and she questioned if that mattered. TFO Terranova advised her that it only mattered because Garner had denied knowing anyone on the flight.

27. In total, $28,721 in United States currency was seized from Garner. The seized United States currency consisted of the following denominations: 279 one hundred dollar bills; 8 fifty dollar bills; 21 twenty dollar bills; and 1 one dollar bill.

28. On October 27, 2017, TFO Terranova and his drug detector canine "Madden" conducted an illegal drug odor investigation of the United States currency recovered from Garner. Madden gave a positive alert for the presence of illegal drug odor from the seized currency.

29. Drug detector dog Madden is owned by Glen Ellyn Police Department, and was last certified prior to this investigation on January 13, 2017. Madden is certified in the detection of the odor of cocaine, heroin, ecstasy, methamphetamine, and marijuana.

30. Prior to this October 24, 2017 seizure, Garner was involved in other DEA seizures of currency. In 2009, approximately $57,200 was seized from Garner and his associates and subsequently forfeited as drug proceeds. In 2014, approximately $145,117 was seized from Garner and his associates by the Pima County, Arizona Sheriff's Office and subsequently forfeited as drug proceeds.

31. For the reasons stated herein and in the attached affidavit, the defendant funds in the amount of $28,721: (i) were monies furnished and intended to be furnished in exchange for a controlled substance; and/or (ii) are the proceeds from the sale of a controlled substance; and/or (iii) were monies used or intended to be used to facilitate a transaction involving illegal drugs in violation of 21 U.S.C. § 841, *et seq.*, and therefore are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, the United States of America requests:

    a.    the defendant funds be proceeded against for forfeiture and condemnation;

    b.    due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed;

    c.    this court adjudge and decree that the defendant funds be forfeited to the United States and disposed of according to law; and

    d.    any trial be before a jury.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney


By:    s/Daniel E. May
DANIEL E. MAY
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-8694
daniel.may@usdoj.gov

NORTHERN DISTRIT OF ILLINOIS   )
                                                         )   SS
COUNTY OF COOK                     )

## AFFIDAVIT

I, Anthony R. Terranova, having first been duly sworn, upon oath, depose and state as follows:

1. I am a Task Force Officer with the Drug Enforcement Administration and have been so employed for approximately 6 years. My duties and responsibilities as a Task Force Agent with DEA involve investigation of alleged violations of the Controlled Substances Act, Title 21 of the United States Code.

2. I have read the complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents, and it does not include each and every fact known to me concerning this investigation but is submitted for the limited purpose of establishing a basis to believe the property identified is subject to forfeiture.

3. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the ___ of March, 2018, in Chicago, Illinois.

                                                                            ANTHONY R. TERRANOVA
                                                                            Task Force Officer
                                                                            Drug Enforcement Administration